Thank you, your honors. May it please the court, my name is Jordan Lawrence and I represent the fraternity and the sorority from San Diego State in this case. We urge this court to reverse the district court because in its stipulations, San Diego State University has admitted that it has engaged in viewpoint discrimination against religious views that are advocated by the student groups on campus. Specifically, the most important stipulation I would direct the court's attention to is page 89, where San Diego State says that several of the student groups recognized by SDSU restrict membership to those individuals, and it goes on to express, who agree with the particular ideology, belief, or philosophy the group seeks to promote. Then you refer to the Catholic Newman Center, the Navigators, and the Latter Day Saints, Student Association, the Baha'i Club, the Society of Women Engineers, that requires 50% of its membership to women majoring in engineering, and the African Student Drama Association that limits its leadership positions to African students. Yes, we have made arguments about that, but this particular stipulation is not directed at any of those things that you brought up. They are listed in Stipulation 35, where the organizations will say, for example, that membership in this organization shall be granted to all students who are interested and committed to embracing the views of the organization. So we're not looking to the ones where they have a racial restriction or a sex restriction. The viewpoint discrimination comes in where every group is allowed, and many do, as that Stipulation 35 shows, requires its members to agree with the viewpoints expressed by the group, or they won't be allowed to be members. Counsel, let me ask you sort of a theoretical question here. The written policy of the university says that on-campus status, and I'm going to paraphrase a little bit, will not be granted to any student organization whose application restricts membership in the campus-recognized chapter or group on the basis of a number of things, including religion, except as explicitly exempted under federal law. So it has to do with restrictions on membership by status. And I guess my question to you is whether there's a difference between restricting membership and allowing viewpoints. For example, this is an outrageous example, but it'll make the point that I'm trying to make. Let's say there's a neo-Nazi group that wants to start on campus, and in fact they'll let anybody in. And any black person who believes in what Nazis believe in can join as long as you believe it. It doesn't actually restrict membership, even though it has a viewpoint. So I guess what I'm curious about in this stipulation, it seemed to me that the stipulation went to cohesive viewpoint and not to restrictions on membership, which to me are slightly different. Could you respond to that concern? I think that, of course, despicable views like that could be expressed on campus, and they could not be censored by the university under the First Amendment. And I think if they allow everybody to join, it would be difficult for a university to come up with a justification unless there was some sort of Thirteenth Amendment badges or instances. Well, I guess that's my point. The stipulation says groups are allowed to have a viewpoint and ask everybody who joins them to share that viewpoint. But that, to me, is different than a restriction on membership. Anybody can join young Republicans or young Democrats, and it would be nice if you joined because you agree with that particular party's philosophy. But we don't say that only men or only women can join, that sort of thing. I guess I just didn't see that Stipulation 35 got you. I would say this. I think that there could be, hypothetically, a situation where you would have some constitutional provisions that are in conflict that you're talking about. But here it was clearly the beliefs of the organization. And I would point, for example, to the letter that was sent by Doug Case, which appears in Excerpt of Record 2378, and it's also Stipulation 210 through 215, where they talk about where it says, We cannot grant recognition to a fraternity or sorority that requires members and or officers to profess a specific religious belief. Yet they allow. So you would have the instance, for example, where if there was a secular anti-war group formed that opposed the war in Iraq, for example, and Afghanistan, they could exclude people that believe in just war or are supporters of the military. But if the Quakers formed a group like this and said, We base our pacifism and anti-war views on the Bible, they would have to allow people that disagree with them. So this case to me is like Rosenberger, where religion is the perspective that's being excluded on topics that are permitted in the forum by SDSU. And that's what makes this viewpoint discrimination and very different from Christian Legal Society versus Martinez. I think the most important one was that the disparate treatment of how their policy applied was remanded. And here it's stipulated, too. The Ninth Circuit said, We're not sure whether or not we're going to be able to do that. Here, the Kent School District is applying their policy in an uneven manner. We remand on that. Here, the university has basically stipulated that they are doing that. So any group can express any viewpoint. They can exclude students as members who don't agree with it, unless the viewpoint is religious, that the group is a spouse. I guess I'm just having so much trouble with that attempted distinction. It doesn't mean that there isn't a factual issue here, necessarily. But one of the bases of nondiscrimination is religion. Yes. So religion may be a viewpoint, but it's also a prohibited basis for discrimination. So I don't know how you would let those things side by side. I would refer to a quote from Justice Alito's opinion in CLS, which I think may get to the heart. I hope that it will. Of course, there is a strong interest in prohibiting religious discrimination where religion is irrelevant. But it is fundamentally confused to apply a rule against religious discrimination to a religious association. So if the synagogue says you have to be a Jewish rabbi to teach the Torah at our Hillel meeting, that's religious liberty. That's not religious discrimination. Now, if the ski club says... But if the Hillel said only Jews may attend services, that would not be allowed. Anybody can come. And there's no issue about attending of meetings here. These meetings are open to the public, and that's not what's at issue. It's the members who select the officers and who generate the viewpoint to advocate. So we're not talking about some exclusive thing here. It would be like the difference between some anti-war group allowing people to attend the meeting and people saying, well, because I'm a student, I'm allowed to stand up and grab the microphone and express my views, whether they're contrary to what the view of the organization says. So what the fraternity and the sorority are asking for here is not special treatment, but the same rights and powers that every other student organization has. Because if the group is not organized around religious beliefs, it can assent to no religious discrimination, because if it's the ski club or the anti-war club, whatever your religious beliefs are, are not going to change the view. It's whether you're like-minded on that. It's only as applied to this situation. This is an as-applied challenge to the religious groups. It excludes them basically from the main... Let me think this through. Let's go back to 1955. Let's go to Alabama. This policy is nominally in place at a state university. A group of African-American students want to get together, have an organization to discuss ways by which they can secure their civil rights. Not only on the campus, but in the community. They're not anxious to do this. They'd like to keep this low visibility. It's 1955. They just want African-Americans at the meetings. Are they in violation of the policy? If they make it racially selective? Yeah. They say they only want African-Americans at the meetings. In 1955, that might have been with good cause. Who's going to be an activist in the African-American community might have made a difference in who got shot and who didn't in the community. My question to you is would they be in violation of the policy? I'm not sure. I have not thought about it in a 1955 context. I do think you have the 13th Amendment type badges as an incidence of slavery issue that would treat a racial exclusion quite differently. Suppose a group of Muslims wanted to get together on San Diego State's university campus now to have discussions among themselves about how to cope in what they would perceive as a hostile environment given the present international situation. And they say all they want at those meetings are committed Muslims. They want to discuss this among themselves because they're worried about issues of self-preservation, of not being forced to absorb themselves into the greater community. Are they in violation if they try to have public affairs? Your Honor, the difficulty I'm having answering the question is that the issue has never been, in this case, attendance at meetings and that generally the meetings are open to the public. Well, let's revise Judge Ripple's question so that you'll answer it and say that they restrict their membership to Muslim students because they want to discuss issues of how Muslims cope. Yes, you have to agree with the promotion of Islam to be a member. No, you have to be a Muslim to be a member. You have to be a Muslim. Well, you have to, it would have to be stated, I think that it would have to be stated in terms like we're trying to do here and as the letter did, they said because you say the officers and members have to profess a belief in Jesus Christ, then that's a religious-based exclusion. So if they said, I think what the university would do is say you have to clarify, be a Muslim, what do you mean? Are you saying it's identity or belief? You're fighting hard against this hypothetical, but it seems to me pretty clear that the answer would be that's a violation of the written policy and you can't be a student, you can't be an official group. The question then becomes if the university doesn't live by its written policy, then you may have a different factual issue about whether they are random or whether they're singling out religious organizations for exemptions from the written policy. But it seems clear, I think, from Judge Ripple's example that that would not be permissible under the written policy. Well, their policy does permit that they've stipulated to, for them to say you have to agree with the mission of our group and that it's not identity-based the way that you're posing this. And that the university here clearly excluded these two groups because, in stipulations 210 through 215, because of the beliefs that they said their members and their officers had to assert. So the religious groups are uniquely held back in a way that no other group is. And that's why we're saying that this is viewpoint. Well, what makes it difficult is that religion is both an identity and potentially a viewpoint. It's what makes it different than, say, gender, which is a fact different from a viewpoint. But I think there's a very different situation if you have the ski club saying we don't want Hindus to join and a Christian group like you're saying you have to agree with our religious beliefs. I just think you could have pretext in any kind of context that's hiding illegal discrimination. But I think a religious group saying you have to agree with our creed statement is not the kind of religious discrimination that we'd see at country clubs in the past that excluded Jews and blacks, etc., things like that. So we would argue that this case is like Rosenberger, that this case is similar in that the religious viewpoints are singled out and excluded. Let me ask you this question. Is there a tribal issue here, whether the university has singled out plaintiffs for different treatment while allowing other groups to contravene that non-discriminatory policy? And what I'm referring to are the groups that I mentioned earlier, the Newman Club. Their application states that its officers must be members in good standing with the Catholic Church and the Navigators. Its application states that membership is open to all those who desire to grow in their faith by exploring the Bible and serving others, and that officers must live in a manner consistent with the teaching of Jesus, the Latter-day Saints. Their application states that the group requires members to adhere to LDS church standards. The Baha'i Club's application requires members to assent to its principles and purposes, which include furthering the tenets of the high faith and the women engineers, which requires 50 percent membership of women engineers. It requires members to maintain their national charter, and then the African Student Drama Association, which limits its leadership to African students. Are you complaining about those groups that they're allowed these benefits, and yet there's requirements of membership in churches and certain requirements of gender and certain requirements of ethnicity? We are, Your Honor. I think that the viewpoint discrimination argument we feel is stronger. I don't think that there's an issue of tribal fact, because how we got all that evidence was submitting a documents request to the university of sending us all the student constitutions that they had approved, and what you've read there is what they've sent to us, so they can't dispute what they sent to us. Aren't you arguing in a sense that these other organizations got what you want for your organization, and that you're being discriminated against on that basis, that these rules aren't being uniformly applied? Yes, Your Honor. The only thing I would say is I think that the examples in Stipulation 35 are clearer examples of viewpoint discrimination, but we do think that this is what you have read, and we've argued this, are other examples of uneven enforcement of this policy. Yes. Well, I'll tell you what bothers me, all right? Yes. The impetus of the school was, we're all Americans, we're all together, we're all united, and what bothers me about all these organizations is that they have the tendency to fractionalize different people. You see what I mean? That's one of the problems we face in our society today, and maybe, you know, I'm 87, and maybe I'm a dinosaur, but situations like this don't make me very happy, because I like to think of us as one nation, one people, and that's what we're going to be three or four hundred years from now. But we're going to take a recess right now while I meditate on that. Well, I have time to answer, to respond to that. Yeah, yeah. Thank you, Your Honor. We have free speech here. There's a big sign that says you can't pick it, but that's up there. Thank you. It'll be on this courthouse. All rise. This court is in recess. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.   Thank you. Thank you. Thank you. All rise. All rise. Okay. There's a couple of just quick points that I want to make on this. We are not advocating for some sort of fracturing more into groups, but basically- What did you say? We do not want people to fracture more and more into subgroups. But we are asking for the same treatment that every other group gets on campus. Because now they've stipulated in about the first five stipulations that the whole point of this is for a robust debate on campus to enhance the educational environment. Now, for example, let me just say that I think- Well, but the university has made a decision to do this, which many universities have done. And I don't think there's anything wrong with that. But now, I think that there is still- You can have people disagree and overall have a unity. So, for example, I can remember- I don't disagree with that. Right. I don't disagree with that. So, I think that this is not in trying in any way to be schismatic or anything, but to basically get the same treatment. You mentioned earlier, one of the early oral arguments about your work with veterans. If there's a wide variety of people that are in the military, but if they join together in a group and say, you have to have served in the military so we can have a common voice to advocate on behalf of veterans, I don't think that that's divisive. And if the university were to say, well, you have to allow people who don't agree with your mission as part of it, that would be contrary to- It wouldn't be a reasonable state interest, especially in a forum that says everybody can advocate on any topic. You can, as well, for your specific group, if you students voluntarily come together, you can exclude people who disagree with what you advocate, unless it's a religious viewpoint. And if it's a religious viewpoint, you have to allow everybody in. Now, that means that- Well, almost all religious viewpoints are the same. Love thy neighbor as thyself. Be kind and good to one another. Yes, the golden rule is common. Take care of the old people and the widows and the orphans. Right. But I think if we had clergy members from various religions, that they would say there are distinctives, just as there are as distinctives in other campus groups that might share some general views on environmentalism or something, but they could differ. And the university has chosen to allow them the power to decide whether a certain member agrees or disagrees with their advocacy. And all we're asking here is for the religious groups to be able to- Because that impacts them greatly. They could say, you have to agree with our views on trade with Cuba, but we can't require you to agree with our views on the deity of Christ. I think there's something that's very askew with that kind of a policy that indicates viewpoint discrimination. So I will hope that I can have a moment or two for rebuttal. I don't know about that. It's who you allow to join your group to. That's part of it, isn't it? Well, that's what this court said in truth, that it's a part of expressive association as to who you permit and who you exclude from the group. What are the differences to a group as to whether they have official recognition or not? Because, of course, nothing prevents the group from continuing to exist as a non-official group. Well, we agree that the group is not totally annihilated by this. It cuts them off from the main campus avenues of expression. At San Diego State, they have the Aztec Center and the main plaza where they have tabling. They can't put up banners there. They don't get free rental of the rooms in the Aztec Center. And the rates for non-campus groups are generally ten times higher for an off-campus, non-recognized group by campus. So it's money and access. Well, it's not money. It's not money. It's access to the forum. It's money in the sense that they have to pay more, but it's not money that they're seeking funding. I'm sorry. When you said money, I'm so trained to talk about funding. But they're charged extra because of the viewpoint that they're talking about. And I just want to point out, too, that for a fraternity and a sorority, the way they recruit members is during rush week, which is set up on tables on the plaza there. And they are basically excluded from doing that. So, again, although they can exist like the Christians existed in the catacombs in the Roman Empire, they're basically shut out to the outskirts of campus. And the university stipulated that this is the most severe penalty that it can levy against an organization. I think it's stipulation 41, if I'm remembering correctly, that they can exclude groups from this. So they understand that the implications of this are quite draconian if they don't abide by it, if the religious groups will not abide by this. So I hope the court will give me some extra time at the end. I know I'm way over my 15 minutes after the appellees go. If there's no further questions, Your Honor, I just look because you look poised to ask me one more question. If not, I will. No, I'm asking myself questions. Okay. Thank you, Your Honor. Thank you. It still is morning. Good morning. I'm Susan Westover for the university. I'm going to set aside my outline just for a second here because I'd like to just go right into Judge Fragerson, your apparent issues with some of the student groups that have been allowed recognition. How do you square that? Because every single solitary one of those groups and the records signed off on the policy, every group submitted their constitution and their membership application expressly signing the nondiscrimination policy, and every officer, they each also had to submit their list of officers, and all of their officers signed off on it. It says, you know, like the Newman Center, its officers must be members in good standing with the Catholic Church. And there is likely some administrative issue with somebody not catching that line, but for Catholic Newman, the excerpts of records 2450, they stated that all are welcome. On their student officer list, ER 2452, the officers signed off that they will all abide by the nondiscrimination policy as to membership and officers. It's right there on the form that they signed. Their membership constitution, 2454, they have the exact, the CSU and the SDSU nondiscrimination policy built into their constitution, and they all signed off on it. So they may have made some, there may be some contradiction in the documents they submitted, but what the university looked at was promises to abide by the nondiscrimination policy, but each one of these groups, and every single one of the groups, the LDS, the Navigators, African Drama, all of those, the Chinese students, all the groups that the plaintiffs had taken issue with in their briefs, they all signed the policy. The only ones that refused to sign it were the plaintiffs. So there was no... So it might dilute the effectiveness of the organization from the organization's viewpoint, but you're saying notwithstanding that, you know, the Hillel is going to let anybody join and the African students will let anybody join if they want to. They will let them join, and they have promised in writing in multiple documents to do so. The, also on the issue of this, you know, diluting the message, the plaintiffs have liked to rely on, you know, the Dale case where a homosexual wanted to become a scout leader, and in fact was a scout leader, and then, you know, came out, and then they removed him. And the Supreme Court said, fine, that was, you know, forced inclusion, and we can't enforce the Boy Scouts to allow him to remain in Hurley. We had the, you know, the St. Patrick's Day parade. We've got people get, you know, forced inclusion. In this case, the plaintiffs have admitted throughout the case in the stipulations that no one was trying to get inside their group. No one ever applied for their group. They didn't ever have any interlopers. They didn't have anybody who disagreed with their message trying to get in their group. So there's no evidence in this record to support this forced inclusion argument. Well, I suppose at one level, if you're, I mean, if your viewpoint is that you shouldn't, I mean, this is not this case, but if your group's viewpoint is that only people of your group are valuable, and that nobody else should be included, you know, whatever your group happened to be, then you would have to choose between pursuing that viewpoint and pursuing university blessing. Maybe depending on the viewpoint. The university doesn't really take an interest in whether the tennis club wants to exclude golf players, but the university would take a strong interest in enforcing federal and state anti-discrimination laws, that if the tennis club wanted to exclude wheelchair-bound, you know, disabled persons, that would rise to the level of university trying to... Well, to go back to Judge Ripple's example from before, if there were a Muslim student group that said flat out, only Muslims can belong to this group, then they simply wouldn't get university approval. They absolutely would not get university recognition. Even if the reason for the organization was to explore that particular religion or to practice it. Yes. If they had a blanket exclusion of anybody who wasn't a Muslim, they would not get recognition under the university's policy. They would still be able to meet on campus. There's no prohibition against informal groups of students meeting all over campus. But to go back to that example, if instead they said, well, you don't have to be a Muslim, but to be a member you have to agree not to eat pork, you know, to follow the rules of halal, and you have to, if you're a woman, agree that you'll cover your head when you're at our meetings and things like that, that would be okay because those are behavioral and anybody could still follow those. Anybody could follow them. What the university doesn't want to do is get into the position of having to judge people's, judge these groups in terms of the sincerity of their religious beliefs. So if we have, you know, I've given these examples before, if we have a group of white supremacists and they say they just want to exclude Latinos and Blacks, you know, we would say, absolutely, that's a violation of our policy. We're not going to let you become a recognized group. And then they could turn around and do some amendments to their constitution and say, wait a second, now we're resubmitting, but we want to quote something or misquote something out of the Bible that supports our belief. And so, you know, if we have a sincerely held religious belief that we can't associate with people of other races, we still would not give them recognition. And we can't, you know, have the people on campus looking at the police. So if, in this instance, if the group were to say that anyone is welcome to join who either agrees with our ideas or is sincerely interested in pursuing them, but were to take all comers and sign the non-discrimination policy, that would be fine. That would be absolutely fine. So they're free to pursue the viewpoint to the umpty ump. It's the membership criteria and refusal to sign the policy that are at issue. Exactly. Every student group has, at the top of their membership application, a statement of the purpose of their group. And we don't really filter anybody out based upon their purpose. You know, we list them all on the web page. So students can show, you know, what they're interested in. So you can have young communists and young fascists and Christians and militant atheists and all those people as long as they'll accept any member not based on the prohibited criteria. Exactly. So students can organize and form around their beliefs and their shared interests. And they do. We've got at this time in question, in 2006, we had 115 organizations at San Diego State. And they can form around shared common interests, but they can't exclude their fellow class members. And that's very consistent with this court's decision in truth and with the Supreme Court's decision in CLS and with Rosenberg. CLS decided this case? CLS did not decide this exact case because of the all comers. You know, so I think there's a footnote in Justice Ginsburg's opinion where she indicates that, you know, we're not getting to it, but we're certainly not adopting what the dissent is saying. And then Justice Stevens in his concurring opinion, that that's this case.  Truth had a non-disclosure clause. So you don't think the truth can be distinguished in a principled way? I don't think truth is distinguishable. I think truth governs. What would you do with the hypothetical I posed to your colleague of the group that wanted to meet down in the South in the 1950s and wanted to keep its composition all African American? I would suggest to them that they can meet as a non-recognized group. They can meet off campus, wherever and whenever they want. They can meet on campus, but they have to pay, you know, slightly larger if they want to get a room rental. You know, the rates at the time in 2006 were like, you know, $8 versus $35. So you can exist with just, there'll just be a greater burden on your participating in campus life? Yes. And you think that burden is constitutionally permissible? I do. Why? Because the Supreme Court decisions have held that you can have these kinds of incidental burdens. That's an incidental burden. $8 versus $35? No, excuse me, that's part of it, but you have also apparently admitted that non-recognition is the greatest penalty that a university can enforce on a student group. There is an element of ostracism for this, is there not? You marginalize them. Well, I wouldn't say they're marginalized because in this day and age, these students, their group have continued to function. They were still, you know, in the evidence that we submitted in support of our summary judgment, we showed that they had viable programs. They still met on a regular basis. They had activities. They weren't marginalized. The government, the university, is picking and choosing by the implementation of this policy which groups and which points of view it wants to favor and which it does not, is it not? No, I would say we are not looking at their viewpoints. We are looking at who they want to exclude. So whether they want to exclude people because of their religious beliefs or because they don't like them or because they, for any reason, we're just looking at who they're excluding. And the precedent allows for reasonable campus rules and regulations, including non-discrimination policies. This court decided that in the Prince v. Jacoby case. Let me tell you, I have a problem with this, and I read your brief, and I have a problem. If I go back, just going back over American history and looking at all of the small splinter groups, weird groups, if you want, in their time, the LDS were a good example. When they began in upper New York State, they were considered a weird little group. Today they're a flourishing religion in the United States. Groups like this tend at their beginning, in their incipient stages, to want to band together. They want to do it in privacy. They want to do it among their own while they get comfortable with their beliefs and how their beliefs ought to be implemented. Sometimes they want to do it among themselves out of fear, perceived or actual. And it seems what the state of California has done is come down like a hammer on groups like that or future groups in this country like that. They will not exist in California universities. They can go to some other state, but California is not going to allow that kind of fringe thinking in its universities. Well, if they are indeed wanting to develop their groups in private, they wouldn't be applying to be an officially recognized group of the California State University. Sure, they want to attract the students among your... It's a huge university as I understand it. They want to attract... They want to pull in all of the students who are legitimate members of that group as they see it. And this is... It's a big help to be an organized group. But you are affirmatively discouraging that group from coalescing on your campus. You don't want them all to get together on your campus. Well, I would respectfully disagree because we've got lots of groups that are very similar to the message that the plaintiffs want to give. But if the coalescing factor happens to be, as your colleagues point out, religion, you don't want those religionists getting together on your campus. That's not true. The record shows that we've got lots of religious groups on campus, lots of recognized religious groups, Christians, evangelical Christians, Jews, Muslims, LDS. Many of whom apparently signed the forms just to keep you happy. And in fact are not following the statements they made on those forms. The record shows there had never been a complaint of discrimination by anybody against those groups. No student had ever raised an issue if they had actually been, you know, tried to get in. So there's no evidence of noncompliance with what you're saying. Exactly. Okay. There was none. But if you just charged them all the same with that, what would be wrong with doing that? Why wouldn't you want to do that? Because we also allow members of the public to reserve rooms. So having absolutely no connection to the university. And there's no reason to give just general members of the public such discounted rates. I'm just talking about students. General members of the public. Student groups. I suppose they could come up with an alternative charging mechanism for room rental rates. Just charge the student groups. Charge them all the same whether they're official or unofficial. But then we'd have no policing mechanism in place to determine whether they really were a student group. You know, there's all kinds of policies that they have to sign off on once they become recognized student groups. For example, to not serve alcohol to underage students, those types of things. And so we can police that when they're a member of the recognized organization. How do you do that? You go to the meetings, watch what they do? Sometimes they do, yes. They do. And if they hear of any violations, of course, they pursue those. But this is all the other groups that we mentioned have agreed not to discriminate. They've all agreed, and it's all in the record. Every single one of them has signed off. The first groups that ever tried to challenge it and failed to sign off on the policy, which is embedded in the officer's statement and in the Constitution and the application, was these plaintiffs' groups. Every other group, including numbers of religious groups, have all signed off on it. But isn't that just the point? We protect in this country non-mainstream groups. Your policy is aimed at protecting mainstream groups and disparaging fringe groups, minority groups. No, the policy is aimed at protecting people against discrimination on the basis of race, religion, gender, disability, all those protected grounds, without regard to the beliefs of the students. Whether they want to discriminate on the basis of their sincerely held religious beliefs or because of their own old-fashioned prejudices, we don't care. We're not looking at what their viewpoints are. We're just looking at what the conduct is, and it excludes university students. And in our educational setting, it's our mission to educate. We're the state of California. We can't condone and publicly fund groups that are going to discriminate. Well, they're not funding very much these days, are they? That's true. The fees and costs are going up, and we're getting less and less state funding. Students are paying more and more of the burden themselves. All right. Thanks. Thank you. Thank you. You look like a professor. How can I say no to you? You're the presiding judge, and I abide. First, I just point out in Stipulation 52, we have an example that the universities agree to where the renting of the Montezuma Hall of the Aztec Center, if you're a registered student organization, is $150. If you're not, it's $1,500. It's ten times the rate. Now, that's one of the larger rooms, but it's in the stipulations. And if this is helpful to the court, I'm beginning to realize that there's two sets of examples of student groups that are at least in conflict or something with the nondiscrimination policy. And I realize that, Judge Ferguson, you've been asking about this, and I haven't made this clear. But this helps the court evaluate this. There's one set that seems to be these religious groups, the racial groups, the gender groups, that have specific requirements. And the university's position seems to be with those. And this creates one set of disparities, that if you sign the nondiscrimination statement, we will ignore clear provisions in your organic constitution documents that contradict what you're saying. And so then it creates this sort of strange undermining of the nondiscrimination policy. And I think that those are the types of things that you're referring to. Now, what I would just, as an advocate, would say, there's a second set, which is in the Stipulation 35, where groups that are just advocating some position say, you must agree with what we say or you can't be part of the group. Now, I would suggest that the Newman Center is exercising the same power that the National Organization for Women, student chapter, Planned Parenthood student chapter. They're saying, you have to agree with our basic tenets in order to be a voting member or an officer. Now, the racial exclusionary policies, the gender ones, bring up some different issues. But it does seem to me that there's this uneven way that they do it, but it's in kind of two dimensions where they do it. I, as an advocate, would suggest that what's under Stipulation 35 is more relevant because it's all viewpoint-based. Now, I also want to point out that the university never turned these groups down because they said, you won't sign the policy. What they did was they went through their constitution very carefully and said, and this is stipulated in 210 through 215, they said, your requirement that a member or an officer has personal acceptance of Jesus Christ as Savior and Lord is the thing that disqualifies you from being a registered student organization. We cannot grant recognition to a fraternity or sorority that requires members and or officers to profess a specific religious belief. But you could, I would just add, this isn't in the letter, you could have them profess a specific non-religious belief. And that's what I meant, like, on trade with Cuba, for example, or whatever. And that that would be okay. Now, that's why we think this brings in the Rosenberger situation. I also just want to clarify on truth. I think there's two major distinctions why truth does not control this case. First of all, truth dealt with general members that had no ability to vote for officers or become officers. And so that general membership policy was being addressed. Here we're talking about basically people who attend the meetings, then members who select the officers. So this is a very different situation. And then also, the court in truth said that they felt that they had to remand to try the issue on whether there was disparate treatment along the lines that you were talking about with limiting groups to specific agreement with their groups and that sort of thing. So truth does not address this where we have stipulations where the university is saying, yes, they could do this. And I just simply want to end on this. I lived for a year and a half in Decatur, Alabama in the early 1960s. And I was six years old, and I remember looking at segregated water fountains. I went to a segregated public school. And I think there is something that diminishes the whole impact of fighting for equality to say that a religious group that says, we want to evangelize people, we think we've got the right views here, so we want people who are like-minded to join us, is like something that happened in the South in the 1960s, in the segregation. I think it just debases the currency of civil rights discussion to put these things in the same level. And I think it is absolutely reasonable and commonsensical for like-minded people to say, we're going to advocate for vegetarianism or for the end of war in Iraq, and you have to agree with us so we can band together as like-minded individuals. And to liken that as segregation or racist, to me, is mixing apples and oranges. In fact, under San Diego State University policy, this sorority and this fraternity could not bar people who believe that the Bible teaches white supremacy. They could not bar them from their group. And that, to me, shows that there's something very, very wrong with this policy. And we urge this court to reverse the district court and to rule that this is viewpoint discrimination based on religion. Thank you. All right. Thank you. And this matter stands submitted. And we'll go on to the final case on the calendar, U.S. versus GU.
judges: Pregerson, Ripple, Graber